# EXHIBIT A-3



**APPLICANT SCREENING PRODUCT CENTER USE AGREEMENT**

RealPage, Inc. (the "<u>RealPage</u>")          and          <u>Fairfield Properties, LP</u> ("Client")
4000 International Parkway                                  <u>5510 Morehouse Dr, Suite 200</u>
Carrollton, Texas 75007-1913                               <u>San Diego, CA  92121-3722</u>

Premises. The undersigned manages multi-family communities (each a "<u>Site</u>"), either on its own behalf as owner of the Site, or as an agent of the owner of the Site ("<u>Property Manager</u>"). In all instances, the undersigned, whether executing this Use Agreement as owner of the Site, or as agent for the owner of the Site, is referred to herein as the "<u>Client</u>". RealPage, Inc. ("<u>RealPage</u>") is the owner and licensor of a multi-family applicant screening system and service known as the Applicant Screening Product Center (the "<u>Screening Product Center</u>" or the "<u>Service</u>"), which assists Clients in evaluating applications made by persons desiring to lease apartments at Sites.  Through use of the Service, Client accesses information from the databases of the national credit bureaus ("<u>Credit Bureaus</u>"), third party databases and from RealPage's own databases.  Such information may include, without limitation, credit history, resident history, criminal history and eviction history (all of the information available through use of the Services, the "<u>Information</u>"). Client desires to license access to and use the Service at Sites. This Applicant Screening Product Center Use Agreement ("<u>Use Agreement</u>") sets forth the terms and conditions under which RealPage licenses the Screening Product Center to Clients for each Site designed on the corresponding order form ("<u>Order Form</u>"). The Order Form identifies the Screening Product Centers that Client wishes to license, the Sites for which the Screening Product Centers have been licensed, along with the commercial terms for the license of these Screening Product Centers. Once the parties have executed a Use Agreement and a corresponding Order Form, the parties shall have created a binding, legally enforceable obligation for RealPage to provide and Client to accept and pay for each of the Screening Product Centers for each Site shown on the Order Form. The Use Agreement and Order Form for each Site shall be Site specific and shall be a separate and independent agreement by and between RealPage and the Client, performable and terminable separately from all other Use Agreements.  RealPage and Client intend to be legally bound by the provisions of Sections 1 through 22. RealPage and Property Manager, on its own behalf, each intend to be legally bound by the provisions of Section 23 of this Use Agreement.

**1.  License Grant to Access and Use.**  RealPage hereby grants to Client with regard to each Site identified on the Order Form(s) a limited, revocable, terminable, non-transferable, non-exclusive, use-restricted license to access the Screening Product Center and use the Service solely for management and operation of the Site(s) identified on the Order Form. Client may execute additional Order Forms from time to time to add new Sites. Any use of the Service by new Sites shall be subject to the terms of this Use Agreement. All rights not specifically identified in the License are reserved to RealPage.

**2.  Charges and Payments.**  Client shall be responsible for payment of all charges arising under the terms of this Use Agreement for each Site, and Client shall pay RealPage for the Service either on its own behalf or through the agency of the Property Manager. The Yearly Access Fee for the Service is an amount equal to the number of units at the Site multiplied by the Projected Percentage Utilization (PPU) for the each Site set forth on the Order Form. The PPU represents the projected number of Service reports run for the Site in a year, divided by the total number of units at the Site rounded up to the nearest 10%.  If the actual number of Service reports ordered for the Site during any one-year License term for the Screening Product Center multiplied by the per unit yearly access fee exceeds the actual amount billed for Service for the Site by more than 10%, then RealPage will charge Client at the end of each Term a "true up" charge equal to the difference multiplied by the per unit Yearly Access Fee, and the "true up" charge shall be due within 30 days of the date of such invoice. Client shall pay any tax (and related interest and penalties) imposed for Client's access to or use of the Screening Product Centers, or as a result of the existence or operation of this Use Agreement, including any tax that Client is required to withhold or deduct from payments to RealPage, other than tax imposed on RealPage's net income or corporate existence. Notwithstanding any other provision in this Agreement, RealPage may adjust prices for the Services at any time with prior notice to Manager ("<u>Notice</u>") and the new prices shall be effective on the date identified in the applicable Notice.

**3.  Term and Termination of Agreement and License.**  The initial term of this Use Agreement and the license granted herein for each Site will commence on the date of activation[1] and shall continue until the last day of the twelfth calendar month next following the calendar month in which

activation shall occur (a "<u>Term</u>"). Thereafter, this Use Agreement and the license contained herein for each Site shall automatically renew for an additional one year Term on the day next following the day on which the preceding initial or renewal Term expires, unless either RealPage or Client shall have given the other written notice of termination no less than 30 days prior to such expiration date.  However, RealPage may immediately terminate the Service, without prior notice, if Client(s) breaches any material provision(s) of this Use Agreement, including without limitation, violation of the Fair Credit Reporting Act, 15 U.S.C. Section 1681 et seq., as amended (the "<u>Act</u>").

**4.  Screening Product Center Warranty; Remedies; Intellectual Property Indemnity**

   (a)  <u>Screening Product Center Warranty</u>.  RealPage warrants that each Screening Product Center will perform the functions set forth in the then current version of the Screening Product Center Specifications applicable to the Screening Product Center. If used in the manner and environment described in such Specifications.  RealPage warrants that it will provide the availability, security, support, fixes, maintenance, average response times, and notices of upgrades and enhancements set forth in the then current version of the Service Level Specifications, if the Screening Product Center is used in the manner and environment described in the Screening Product Center Specifications. The most current version of Screening Product Center Specifications and Service Level Specifications can be found at http://www.specifications.controls.realpage.com.

   RealPage shall not modify or remove material functionality from the Screening Product Center Specifications unless it provides Client no less than 60 days prior written notice of such modification. RealPage shall have no responsibility for failures of the Screening Product Center(s) arising from any Derived Software, misuse of a Screening Product Center, equipment or communications malfunction or other software products not licensed by RealPage.

   (b)  <u>For Breach of Warranty of Availability and Response Time</u>.  Subject to the limitations set forth herein and as Client's sole remedy for the breach of the foregoing warranties, for each day that availability of the Screening Product Center falls below the Availability Period set forth in the applicable Service Level Specifications, or for each day the average response time of the Screening Product Center is greater than the

Page 1

---
[1] "Activation" occurs as to a Site when Client is enabled to order a Service report, regardless of whether the Screening Product Center is in production

Form © 2006 RealPage, Inc.
A.5.7
SPC 05.04.06 Version 6.1


EXHIBIT
A-3          REDACTED          REALPAGE00005

**∴∴ REALPAGE**

average response time within RealPage's data center(s) set forth in the applicable RealPage Service Level Specifications, the Term of the Screening Product Center license shall be extended by one day at no additional charge. This shall be each Client's sole and exclusive remedy and RealPage's sole and exclusive liability for the breach of the warranty of availability and the warranty of response time.

(c) **For Claims Relating to the Information.** Subject to the limitations set forth herein, a Client's sole remedy for all claims (whether in contract, tort, negligence, strict liability, or otherwise) relating to the Information provided hereunder, shall be RealPage's re-run of the Information request if such can be accomplished through the exercise of commercially reasonable efforts. If RealPage is unable to provide such remedy, RealPage shall grant Client a credit of an amount equal to the Monthly Access Fee for the applicable Site divided by the number of Information requests made by the applicable Site in the month in which RealPage is re-run of the Information. The foregoing states Client's sole and exclusive remedy and RealPage's sole and exclusive liability with regard to the Information provided hereunder.

(d) **Intellectual Property Indemnity.** If a third party makes a claim against Client that the access to the Screening Product Center or use of the Service licensed by Client pursuant to this Use Agreement, excluding any of the Client Data, directly infringes any United States patent issued as of the date of this Use Agreement or any copyright, trade secret, trademark or other Intellectual Property Rights ("**IP Claim**"), RealPage will indemnify, defend and hold harmless Client against the IP Claim and pay all costs and expenses (including reasonable legal fees, including on appeal) incurred and all damages, and all other amounts ancillary to the award of such damages, finally awarded against Client by a court of competent jurisdiction or agreed to in a written settlement agreement signed by RealPage arising out of such IP Claim; provided that: (i) Client promptly notifies RealPage in writing no later than thirty (30) days after Client's receipt of notification of a potential claim; (ii) RealPage may assume sole control of the defense of such claim with counsel of its choice and all related settlement negotiations; and (iii) Client provides RealPage, at RealPage's request, with reasonable assistance, information and authority necessary to perform RealPage's obligations under this Section. If RealPage believes that the RealPage System or any Screening Product Center is likely to be determined to be an infringement or misappropriation of a patent, copyright, trade secret, trademark, or other proprietary right, RealPage may (i) modify or replace such RealPage System or Screening Product Center to make it non-infringing; provided, however, no such replacement or modification shall substantially impair the functionality or performance of such RealPage System or any Screening Product Center or (ii) terminate the license with respect to the infringing RealPage System of Screening Product Center.

5. **Order and Supply of Information.** When initially establishing an account with RealPage, Administrative Personnel ("**Administrative Personnel**") will supply RealPage with Client Data reasonably required to identify the Site, Client, and any Site manager. Client shall order Information and shall use Information solely and exclusively for the purpose of determining the creditworthiness, criminal record and eviction history of individuals from whom Client(s) has accepted a signed rental application agreement relating to residency at the Site (the "**Permissible Purpose**"). When Client desires to receive Information concerning individuals for the Permissible Purpose, Administrative Personnel will supply RealPage with Client Data reasonably required to identify the prospective resident by completing the applicable Leasing templates. Upon receipt of this Client Data, RealPage shall use commercially reasonable efforts to furnish the requested Information to Client. RealPage shall be under no obligation to provide any Information in any instance in which doing so would result in any violation of RealPage's obligations under the Fair Credit Reporting Act, 15 U.S.C. Section 1681 et seq., as amended (the "**Act**") or of RealPage's agreements with the Credit

Bureaus. If no Information or only partial Information is available from any Credit Bureaus or from its own resources, RealPage shall be relieved of the obligation hereunder to supply such Information or component thereof.

6. **Client's Covenants and Certifications.** Client agrees and covenants that: (i) it will not request or use any Information for any purpose prohibited by the terms of this Use Agreement, the Act or by other applicable law or regulation; (ii) it will request and use Information only for the Permissible Purpose; (iii) it will request and use Information solely as an end user; (iv) it will not resell, attempt to resell nor disclose any portion of the Information to any third party; (v) it will use the Information entirely at its own risk; (vi) it will bring no action or claim, and hereby irrevocably and completely waives and releases all future actions and claims, against RealPage or any Credit Bureau for any injury or damage arising from or attributable to the provision, non-provision or use of any Information; (vii) RealPage shall have no obligation or liability for delays or nonperformance by the Credit Bureaus; (viii) it understands and acknowledges that Information from public records such as criminal and eviction data is often incomplete, untimely, inaccurate and subject to producing false positives; (ix) it understands and acknowledges that due to the organization of criminal records and/or the nature of the query there will be instances where no criminal information is reported with regard to persons who, in fact, have criminal records; (x) it understands and acknowledges that there is a wide diversity in the types of criminal records made available by various jurisdictions and in the content of such records; (xi) it understands and acknowledges certain laws restrict the use of certain criminal records for purposes related to housing or accommodations; (xii) it will use reasonable judgment with regard to undertaking independent verification of all negative criminal and eviction information; (xiii) only Administrative Personnel having a direct need to know and whose duties reasonably relate to processing applications for leases will be permitted to employ the RealPage Screening Product Center to order, receive or use Information; (xiv) all Administrative Personnel have read the Section to this Use Agreement entitled "FCRA Requirements"; (xv) all Administrative Personnel have agreed to comply with all obligations stated in that Section which are applicable to them; (xvi) all Administrative Personnel will maintain all Information in strictest confidence and disclose it only as permitted by this Use Agreement, the Act (as amended) or by other applicable law; (xvii) all Administrative Personnel shall have read the Section to this Use Agreement entitled "Access Security Requirements"; and (xvii) all Administrative Personnel shall have agreed to comply with all obligations stated in that Section which are applicable to them.

7. **Indemnification by Client.** Client(s), at its own expense, shall indemnify, defend and hold RealPage harmless from and against losses, costs, and expenses (including legal fees and expenses) actually and reasonably incurred by RealPage in connection with any liability (including, without limitation, third party claims by applicants or residents) arising from (i) RealPage's possession or use of data submitted to RealPage by Client(s), (ii) Client(s)'s request for, access to, unauthorized access to, use or misuse of, possession of, disclosure of or reliance upon Information, (iii) Client(s)'s use of any Information in connection with any "scoring" model or procedure, and (iv) any violation by Client(s) of this Use Agreement, the Act or other applicable laws. RealPage shall promptly notify Client(s) of any claim or action of a third party as to which RealPage may seek indemnification hereunder. RealPage's failure to notify Client(s) shall not relieve Client(s) of the obligation to indemnify RealPage unless such failure to notify shall have materially impaired Client(s)'s ability to defend such claim or action.

8. **Maintenance of Substantiation.** Client covenants to maintain for a period of 25 months from the date thereof all signed rental application agreements from applicants pursuant to which Client requests Information hereunder, as well as all other documentation serving to

Page 2

Form © 2006 RealPage, Inc.
A.5.7
SFC 01.04.06 Version 6.1

REDACTED                    REALPAGE00006

**REALPAGE**

demonstrate permissible purpose under the Act, Client covenants to make such available to RealPage upon RealPage's reasonable request.

**9.   FCRA Requirements.**   Although the Act, as amended, primarily regulates the operations of consumer credit reporting agencies, it also applies to RealPage's customers, such as Client(s), as users of information about consumers.   The Act may be found at >www.ftc.gov/os/statutes/fcrajump.htm<.   Client shall review and become familiar with the Act, paying particular attention to the following Sections, which have application to Client as a purchaser of consumer reports. The following list of Sections from the Act is not intended to be inclusive:

| | |
|---|---|
| 604. | Permissible Purposes of Reports |
| 607. | Compliance Procedures |
| 615. | Requirement on users of consumer reports |
| 616. | Civil liability for willful noncompliance |
| 617 | Civil liability for negligent noncompliance |
| 619 | Obtaining information under false pretenses |
| 621 | Administrative Enforcement |
| 624. | Responsibilities of Furnishers of Information to Consumer Reporting Agencies |

By law, credit reports may be issued only if used for certain specific purposes.   One such purpose is extending credit.   Under this Use Agreement the sole Permissible Purpose for ordering and using a credit report is determining the creditworthiness, criminal record and eviction history of individuals from whom Client(s) has accepted a signed rental application agreement relating to residency at the Site.

In addition to the Act, other federal and state laws addressing such topics as computer crime and unauthorized access to protected databases have also been enacted.   RealPage requires users of the Service, as users of consumer reports, to comply with all relevant federal statutes and the statutes and regulations of the states in which their sites are located.

**10. Access Security Requirements.**  In order to ensure consumer's rights to privacy, the Act imposes a legal obligation on those who order and use credit reports.   The Act also provides stringent legal sanctions against parties that violate the Act's provisions.  Credit bureaus, such as the Credit Bureaus and RealPage, have a similar obligation.  The Act requires credit bureaus to furnish credit reports only when a permissible purpose exists.  Under this Use Agreement the sole Permissible Purpose for ordering and using a credit report is determining the creditworthiness, criminal record and eviction history of individuals from whom Client(s) has accepted a signed rental application agreement relating to residency at the Site.

The Credit Bureaus will permit RealPage to provide credit reports only to entities that have accepted a service agreement, such as this Use Agreement, and that continuously meet certain requirements.  One such requirement is that RealPage's clients, such as Client(s), have in place, and adhere to; effective controls designed to prevent the order or use of credit reports for personal and other non-permissible purposes.  To meet this requirement, the Credit Bureaus require that RealPage Clients (and management companies, and their employees and agents) implement and follow the following controls.

• Protect the RealPage account number and password; disclose this sensitive information to authorized personnel only.   Under no circumstance should unauthorized persons have knowledge of the password. Do not post this information in any form within the facility.

• Do not discuss the RealPage account number and password by telephone to any unknown caller, even if the caller claims to be a RealPage employee.

• Restrict the ability to obtain credit information to authorized personnel.

• Place any terminal devices used to obtain credit information in a secure location within the facility. Access to the devices should be difficult for unauthorized persons to obtain.

• Secure devices and systems used to obtain consumer reports after normal business hours or when unattended by authorized personnel.

• Secure hard copies and electronic files of consumer reports within the facility.   Protect files against release or disclosure to unauthorized persons.

• Shred or destroy hard copy consumer reports when no longer needed and when it is permitted to do so by applicable regulation(s).

• Destroy electronic files containing consumer report data when no longer needed or when permitted by applicable regulation(s).

**11.  Warranty Disclaimer.** Other than as expressly and specifically set forth in this Use Agreement, RealPage makes no warranty, guaranty, representation or covenant of any type, express or implied, with regard to any aspect of the RealPage System, including any Screening Product Center or Service. Without limiting the generality of the foregoing and other than as expressly and specifically set forth in this Use Agreement, RealPage hereby disclaims any liability concerning (i) the accuracy, correctness, currency, availability, reliability, loss of Client Data, performance, suitability, compatibility, non-infringement, merchantability, time of performance or fitness for a particular purpose of; (ii) continuous, uninterrupted or error-free access to or use of; or (iii) the results that may be obtained from the use of the RealPage System, including any Screening Product Center or Service.

**12.  Limitation on Types of Damages.** RealPage will not be liable to Client for any exemplary, punitive, special, incidental, indirect or consequential damages (including, without limitation, any damages of any type for lost profits, goodwill, revenues, or business opportunities), even if advised of the possibility of such damages and regardless of the legal or equitable theory upon which the claim of damages is based.

**13.  Limitation on Amount of Damages.** RealPage shall not be liable to Client for any damages, whether arising in contract, tort, strict liability or otherwise in an amount exceeding the aggregate of the Initial License Fee and Yearly Access Fees or Monthly Access Fees, as applicable, paid by Client for all Screening Product Centers licensed for the Site during the 12 month period preceding the occurrence of the event that gave rise to the damages.

**14.  Force Majeure.** RealPage will not be liable to Client for any damages or injury, direct or indirect, caused by any delay or failure in its performance of any of the acts and obligations required by this Use Agreement if and to the extent that such delay or failure arises for reasons beyond the reasonable control of RealPage, including, without limitation, Third Party System Failures. For the purposes of this Use Agreement, "Third Party System Failures" means, as it relates to third party software, hardware or systems, computer downtime; utility or telecommunication interruption; failure, fluctuation or delay; computer virus; electrical surge; or line-noise interference.

Page 3

Form © 2006 RealPage, Inc.
A.5.7
SFC 05.04.06 Version 6.1

REDACTED

REALPAGE00007

**REALPAGE**

**15. Disclaimer of Additional and Other Warranties.** Other than as expressly and specifically set forth in this Use Agreement, RealPage makes no warranty, guaranty, representation or covenant of any type, express or implied, with regard to any aspect of the Screening Product Center or the Service, the Information or the RealPage System. Without limiting the generality of the foregoing and other than as expressly and specifically set forth in this Use Agreement, RealPage hereby expressly disclaims all liability concerning (i) the accuracy, completeness, correctness, currency, availability, reliability, performance, suitability, compatibility, non-infringement, merchantability, time of performance or fitness for a particular purpose of the Service, the Information or the RealPage System; (ii) continuous, uninterrupted or error-free access to or use of the Service, the Information or the RealPage System; or (iii) the results that may be obtained from the use of the Service, the Information or the RealPage System.

**16. Essential Nature.** The indemnification in Section 7, the limitations set forth in Sections 11, 12 and 13 and the disclaimer of additional and other warranties contained in Section 15 constitute (i) essential inducements to RealPage to accept this agreement, (ii) major predicates of the price charged by RealPage for access to the Screening Product Center, the use of the Service, the use of the Information and access to the RealPage System and (iii) conditions precedent to RealPage's agreement to be bound by the provisions of this Use Agreement. No access to the Screening Product Center or use of the Service, the Information or the RealPage System, is authorized except subject to these indemnifications, limitations and disclaimers.

**17. Maintenance of Substantiation.** Client covenants to maintain for a period of 25 months from the date thereof all signed rental application agreements from applicants pursuant to which Client request information hereunder, as well as all other documentation serving to demonstrate permissible purpose under the Act, Client covenants to make such available to RealPage upon RealPage's reasonable request.

**18. Survival of Terms.** The provisions of this Use Agreement applicable to (i) any Screening Product Center License; (ii) outstanding obligations of Client at the date of termination; (iii) warranty disclaimer; (iv) indemnification; (v) limitation of liability, types of recoverable damages and amount of recoverable damages; (vi) integration; (vii) survival of terms; (viii) confidentiality and non-disclosure; and (ix) limitation of actions will survive termination or expiration of this Use Agreement.

**19. Amendment.** This Use Agreement may be amended, altered or modified only by an instrument in writing, specifying such amendment, alteration or modification, executed by both parties.

**20. RealPage's Ownership.** Client acknowledges that RealPage is the owner of all Screening Product Centers, the RealPage content (except for third party content), Derived Software, the RealPage databases and the RealPage data and that all Screening Product Centers are protected by copyright, trade secret and other intellectual property laws and legal precedent of the United States and other jurisdictions. No title-to-or ownership of any Screening Product Center is transferred to Client by operation of this Use Agreement.

**21. Sale of the Site.** Where Client sells or otherwise transfers a Site, this Use Agreement, together with any applicable addenda, shall terminate at the end of the month in which the sale or transfer occurs. Where a Site is sold or transferred, unless RealPage has received written instructions from the parties to the contrary, (i) RealPage will consider Client Data for the Site stored in any Screening Product Center to have vested in the new owner of the Site; and (ii) Manager shall no longer be permitted access to the Client Data.

**22. Miscellaneous.** For purposes of the disclaimer of warranties and consequential damages, limitation of liability and Client indemnities, the term "RealPage" shall be deemed to include all RealPage licensors of software and providers of services made a part of the RealPage System. If any part of this Use Agreement is held to be invalid, illegal or unenforceable, such part will be treated as severable, and the remaining portions of the Use Agreement shall continue to be valid and enforceable as to the parties hereto. Nothing in this Use Agreement, express or implied, is intended to confer upon any person or entity other than the parties and their respective successors and assigns, any rights, remedies, obligations or liabilities. The failure of either party hereto at any time to enforce any of the provisions of this Use Agreement shall not be deemed or construed to be a waiver of any such provision, nor, in any manner, affect the validity of this Use Agreement, any provision hereof or the right to thereafter enforce each and every provision of this Use Agreement. No waiver of any breach of any of the provisions of this Use Agreement shall be effective unless set forth in a written instrument executed by a duly authorized officer of the party against whom enforcement of such waiver is sought, nor shall it be deemed or construed to be a waiver of any succeeding or other breach of this Use Agreement. All notices required to be given hereunder shall be given in writing and shall be delivered either by hand, by certified mail with proper postage affixed thereto, or by facsimile (with confirmation copy sent by Registered mail) addressed to the signatory at the address set forth above, or such other person and address as may be designated from time to time in writing. All such communications shall be deemed received by the other party upon the earlier of actual receipt or actual delivery. This Use Agreement — together with any applicable addenda, schedules, Order Forms, Product Specifications and Service Level Specifications — sets forth the entire understanding of the parties hereto with respect to the subject matter hereof and supersedes, replaces and terminates all prior and contemporaneous letters of intent, agreements, covenants, negotiations, arrangements, communications, representations, advertisements, selling brochures, sales presentations, understandings or warranties, whether oral or written, by any officer, employee or representative of either party with respect to the subject matter hereof. Neither party is relying upon any warranties, representations, assurances or inducements not expressly set forth herein. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED UNDER THE LAW (INCLUDING EQUITABLE DOCTRINE) OF THE STATE OF TEXAS (WITHOUT REGARD TO THE CONFLICTS OF LAW RULES).

**23. Property Manager Obligations.** SECTIONS 23(a) THROUGH 23(f) INCLUSIVE SHALL BE CONSIDERED TO BE A CONTRACT BY AND BETWEEN THE PROPERTY MANAGER AND REALPAGE.

(a) **Property Manager's Right to Use.** Upon Property Manager's acceptance of this Section 23, Property Manager shall have the right to access and use the Services at any Site and on behalf of each Client identified on any Order Form created pursuant to this Use Agreement.

(b) **Property Manager's Representations and Warranties.** Property Manager represents and warrants to RealPage that Property Manager has been appointed by each Client, and has the authority pursuant to such agency, to: (i) enter into this Use Agreement and an ancillary Order Form on behalf of each such Client; and (ii) cause the payment, in behalf of each Client, of all invoices for Services in accordance with the provisions of any applicable RealPage Product Order Form and RealPage Price Schedule.

(c) **Property Manager's Indemnity.** Property Manager shall defend, indemnify and hold harmless RealPage from and against all claims, losses or liabilities (including reasonable attorneys' fees and expenses) arising, directly or indirectly, from any misrepresentation by Property Manager with regard to the existence and scope of its agency

Page 4

Form © 2006 RealPage, Inc.
A.5.7
SFC.05.04.06 Version 6.1

REDACTED

REALPAGE00008

04/30/2008 16:39 FAX 972 820 3932     RealPage, Inc.                     P.1
                                                                        Ø002

**∴ REALPAGE**

relationship with any Client, including, without limitation, losses or liabilities arising from any misrepresentation concerning its authority to bind any Client to the payment provisions of Section 3 of this Use Agreement.

(d) **Property Manager's Covenants.** In consideration of receiving the right to access and use the Service on behalf of Client(s), Property Manager covenants that Property Manager will not use the Service at any Site for which there exists any unpaid undisputed fee or charge associated with access and use of the RealPage System.

(e) **Non-Recourse.** Subject to the provisions of Sections 23(b) and 23(c) of this Use Agreement, RealPage shall look solely to each Client for payment of all fees and charges associated with the Service. RealPage agrees that it shall make no claim against Property Manager for any such

fees and charges unless Property Manager is the Client with regard to a particular Site or unless the provisions of Section 23(d) shall be applicable with regard to a particular Site. Property Manager agrees not to maintain, and hereby waives, all rights, if any, to maintain any suit or action against RealPage premised on any alleged violation of any provision of this Use Agreement to which it is not a party; such waiver shall not apply to this Section 23.

(f) **Cessation of Agency.** If Property Manager's agency relationship with regard to any Site, Property Manager shall deliver to RealPage a written notice to such effect, and Property Manager's right to access and use the Services in behalf of Client at such Site shall immediately cease.

By executing this Agreement below, the undersigned represents and warrants to RealPage, Inc. that it is the Site Owner or the duly appointed agent of the Site Owner of the Site(s) identified on the Order Form, and has the authority either on its own behalf or pursuant to such agency agreement, to: (i) execute the Order Form; (ii) enter into this Agreement on behalf of each such Site Owner; and (iii) administer the payment, on behalf of each Site Owner, of all invoices for all fees and charges associated with implementation (including Fees), access and use of the applicable Services or System on behalf of each Site in accordance with the terms of the Agreement and Order Form. Agent shall defend, indemnify, and hold harmless RealPage, Inc. from and against any and all claims, losses, or liabilities (including reasonable attorneys' fees and expenses) arising, directly or indirectly, from any misrepresentation by Agent with regard to the existence and scope of its agency relationship with any Site Owner, including, without limitation, losses or liabilities arising from any misrepresentation concerning its authority to bind any Site Owner to the payment provisions of this Agreement. In addition, by executing this Order Form below, the undersigned represents and warrants to RealPage, Inc. that the Products, Services, Fees, and Charges provided in this Agreement constitute approved expenditures within the Site operating budget adopted by Site Owner.

SITE OWNER                                          REALPAGE, INC.

☐ through agency of

Fairfield Properties, LP
ENTITY NAME

By: _____                   By: _____
Title: _President_                                By:     Timothy J. Barker
Date:  _5/30/08_                                  Title:  Chief Financial Officer

OR                                                 EFFECTIVE DATE:  _04/30/08_

☐ Site Owner

Fairfield Properties, LP
ENTITY NAME

By: _____
Title: _____
Date: _____

Form © 2006 RealPage, Inc.
A.53
3FC 02.04.06Version 6.1

REDACTED          04/30/2008   6:05PM (GMT-05:00)
REALPAGE00009

REALPAGE

## AMENDMENT TO
## APPLICANT SCREENING PRODUCT CENTER USE AGREEMENT

THIS AMENDMENT TO APPLICANT SCREENING PRODUCT CENTER USE AGREEMENT is entered into as of the Effective Agreement by and between RealPage, Inc. ("RealPage"), a Delaware corporation and FF Properties L.P. ("Client"), a Delaware limited partnership.

### RECITALS:

WHEREAS, RealPage and Client have entered into that certain Applicant Screening Product Center Use Agreement of even date ("Master Agreement") pursuant to which RealPage shall provide to Client for all Sites it owns or manages (each a "Portfolio Sites"), either on its own behalf as owner of a Portfolio Site, or on behalf of third parties as fee manager of a Portfolio Site, the RealPage Applicant Screening Product Center ("Screening Product Center");

WHEREAS, Multifamily Internet Ventures LLC dba LeasingDesk Insurance Services ("LeasingDesk"), a wholly owned subsidiary of RealPage, and Client have entered into that certain Advertising Space Rental Agreement of even date whereby Client shall permit LeasingDesk to promote on an exclusive basis to residents of Portfolio Sites the LeasingDesk renters' insurance ("Renters' Insurance"); and

WHEREAS, in consideration for Client's commitment to license the Screening Product Center for all Portfolio Sites for a period of three (3) years following the Effective Date, RealPage is willing to make certain pricing accommodations for Client, as more fully set forth herein.

NOW WHEREFORE, in consideration of the mutual premises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    In consideration for Client's commitment ("Commitment") to (i) license the Screening Product Center for all Portfolio Sites for a period commencing on the Effective Date (as defined in the Master Agreement) and expiring on July 31, 2011 ("Commitment Period"); (ii) activate the Screening Product Center on all Portfolio Sites on or before July 31, 2008 and (iii) use commercially reasonable efforts to promote Renters' Insurance at all Portfolio Sites, RealPage shall make the following pricing concessions:

REDACTED                               REALPAGE00010

a. <u>For the Applicant Screening Product Center</u>: In consideration of the Commitment, the following Monthly Access Fees shall apply to Portfolio Sites, based upon the penetration of Renters' Insurance at Portfolio Sites:

| Screening Product Center | Monthly Access Fee per Unit, with Criminal | Monthly Access Fee per unit, excluding Criminal | Renters' Insurance Penetration[1] |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

- <u>*With regard to Renters' Insurance:*</u> RealPage and Client shall review on a quarterly basis in arrears the Renters' Insurance Penetration on a Portfolio wide basis, and, based on the tier within which the then current Renters' Insurance Penetration falls, RealPage shall adjust the applicable Monthly Access Fee for the Screening Product Center, effective as of the next occurring billing cycle for all Portfolio Sites.

- <u>*With regard to the Screening Product Center:*</u> RealPage and Client shall review on a quarterly basis in arrears the Screening Product Center utilization at each Portfolio Site, and if there appears to be over utilization or under utilization of the Screening Product Center at a Portfolio Site, may elect to adjust the PPU for a Portfolio Site through execution of a PPU Adjustment Letter on a going forward basis, effective as of the next occurring billing cycle for such Portfolio Site. In the event a Portfolio Site experiences over utilization of the Screening Product Center and Client elects not to execute a PPU Adjustment Letter for such Portfolio Site, Client shall pay to RealPage the applicable PPU "true up", as described in the Master Agreement, at the end of the then current Term.

- <u>*With regard to the Screening Product Center Implementation:*</u> Client shall implement the Screening Product Center at all Portfolio Sites on or before July 31, 2008. In the event Client implements the Screening Product Center at all Portfolio Sites on or before July 31, 2008, RealPage shall waive all Monthly Access fees for the Screening Product Center for active Portfolio Sites, through June 30, 2008.

- <u>*With regard to Screening Product Center Pricing:*</u> In consideration of the Commitment:

    - RealPage shall not increase prior to the end of the Commitment Period, any Monthly Access Fees to exceed above those set forth

---

[1] For purposes of this Agreement, Renters' Insurance Penetration shall mean, as to a Portfolio Site or the Portfolio, the percentage of residents purchasing Renters' Insurance from LeasingDesk.

REDACTED                              REALPAGE00011

above, other than within the context of the adjustments based on Renters' Insurance Penetration; *provided however*, and notwithstanding the pricing commitment made by RealPage in the preceding clause, RealPage may increase the Monthly Access Fees if it experiences an increase in thirty party vendor fees or other expenses over which it has not control (e.g., data providers, credit bureaus, postage, and interchange and other fees imposed by an ODFI, reconverting bank or credit card associations, etc); and

- during the Commitment Period, RealPage shall not impose on Client for any Portfolio Site any premium charges otherwise imposed on a user for eviction searches within certain States.

b. <u>OneSite Leasing & Rents</u>.  Where Client elects to license from RealPage the OneSite Leasing & Rents Product Center for use at a Portfolio Site, RealPage shall issue to Client a credit an amount per Portfolio Site equal to all Fees paid for such Portfolio Site for the Yardi Screening Interface, █████████ per Portfolio Site, effective upon activation[2] of OneSite Leasing & Rents at that Portfolio Site.

2.   To the extent any of the terms and conditions of this Amendment varies from those of the Master Agreement, this Amendment shall control.

3.   Capitalized terms used in this Amendment which are defined in the Master Agreement and not otherwise defined in this Amendment shall have the meanings assigned in the Master Agreement.

4.   Amend the <u>Premises</u> provision of the Master Agreement in its entirety to read as follows:

"The undersigned manages multi-family communities (each a "<u>Site</u>"), either on its own behalf as owner of the Site, or as an agent of the owner of the Site ("<u>Property Manager</u>").  In all instances, the undersigned, whether executing this Use Agreement (as defined below) as owner of the Site, or as agent for the owner of the Site, is referred to herein as the "<u>Client</u>".  RealPage, Inc. ("<u>RealPage</u>") is the owner and licensor of a multi-family applicant screening system and service known as the Applicant Screening Product Center (the "<u>Screening Product Center</u>" or the "<u>Service</u>"), which assists Clients in evaluating applications made by persons desiring to lease apartments at Sites.  Through use of the Service, Client accesses information from the databases of the national credit bureaus ("<u>Credit Bureaus</u>"), third party databases and from RealPage's own databases.  Such information may include, without limitation, credit history, resident history, criminal history and eviction history (all of the information available through use of the Services, the "<u>Information</u>").  Client desires to license access to and use the

---

[2] "Activation" occurs as to a Site when Site Owner Data for the Site is accessible through the OneSite Leasing & Rents Product Center, regardless of whether the Product Center is in production.

REDACTED                                           REALPAGE00012

Service at Sites. This Applicant Screening Product Center Use Agreement ("Use Agreement") sets forth the terms and conditions under which RealPage licenses the Screening Product Center to Client for each Site designed on the corresponding order form ("Order Form"). The Order Form identifies the Screening Product Centers that Client wishes to license, the Sites for which the Screening Product Centers have been licensed, along with the commercial terms for the license of these Screening Product Centers. Once the parties have executed a Use Agreement and a corresponding Order Form, the parties shall have created a binding, legally enforceable obligation for RealPage to provide and Client to accept and pay for each of the Screening Product Centers for each Site shown on the Order Form. The Use Agreement and Order Form for each Site shall be Site specific and shall be a separate and independent agreement by and between RealPage and the Client, performable and terminable separately from all other Use Agreements. RealPage and Client intend to be legally bound by the provisions of Sections 1 through 22. RealPage and Property Manager, on its own behalf, each intend to be legally bound by the provisions of Section 23 of this Use Agreement."

5.     Amend Section 1, <u>Charges and Payments</u>, in its entirety to read as follows:

"Client shall be responsible for payment of all charges arising under the terms of this Use Agreement for each Site, and Client shall pay RealPage for the Service either on its own behalf or through the agency of the Property Manager. The Yearly Access Fee for the Service is an amount equal to the number of units at the Site multiplied by the Projected Percentage Utilization (PPU) for the each Site set forth on the Order Form.  The PPU represents the projected number of Service reports run for the Site in a year, divided by the total number of units at the Site rounded up or down to the nearest 10%. The per unit Yearly Access Fee shall an amount equal to the Yearly Access Fee divided by the number of units at the Site. If the actual number of Service reports ordered for the Site during any one-year License term for the Screening Product Center multiplied by the per unit Yearly Access Fee differs from the actual amount billed for Service for the Site by more that 10%, then RealPage will charge Client at the end of each Term a "true up" charge equal to the additional number of Service reports ordered multiplied by the per unit Yearly Access Fee, and the "true up" charge shall be due within 30 days of the date of such invoice. Client shall pay any tax (and related interest and penalties if Client fails to pay any amounts owed within ten (10) days after Client's receipt of written notice detailing such failure) imposed for Client's access to or use of the Screening Product Centers, or as a result of the existence or operation of this Use Agreement, including any tax that Client is required to withhold or deduct from payments to RealPage, other than tax imposed on RealPage's net income or corporate existence. Notwithstanding any other provision in this Agreement, RealPage may adjust prices for the Services at any time with at least thirty (30) days prior written notice to Manager ("Notice") and the new prices shall be effective on the date identified in the applicable Notice, but in no event prior to the termination of such thirty (30) day period.  If the

REDACTED

REALPAGE00013

prices for the Services increase by more than 10% from the prices charged prior to such Notice, Client may at its option elect to terminate this Agreement upon written notice to RealPage.

6. Amend the last sentence of the first paragraph of Section 4(a), <u>Screening Product Center Warranty</u>, to read as follows:

"The most current version of Screening Product Center Specifications and Service Level Specifications can be found, from time to time, at http://www.specifications.controls.realpage.com."

7. Amend the first sentence of the second of Section 4(a), <u>Screening Product Center Warranty</u>, to read as follows:

"RealPage shall not modify or remove material functionality from the Screening Product Center Specifications unless it provides Client no less than 60 days prior written notice of such modification and, in such case, Client may at its option elect to terminate this Agreement at any time after receipt of such notice by delivering written notice to RealPage."

8. Amend the second sentence of Section 4(c), <u>For Claims Relating to Information</u>, to read as follows:

"If RealPage is unable to provide such remedy, RealPage shall notify Client in writing of such inability and shall grant Client a credit of an amount equal to the Yearly Access Fee calculated on a monthly basis ("Monthly Access Fee") for the applicable Site divided by the number of Information requests made by the applicable Site in the month in which RealPage conducts a re-run of the Information."

9. Amend Section 4(d), <u>Intellectual Property Indemnity</u>, it its entirety to read as follows:

"If a third party makes a claim against Client that the access to the Screening Product Center or use of the Service licensed by Client pursuant to this Use Agreement, excluding any of the Client Data, directly infringes any United States patent issued as of the date of this Use Agreement or any copyright, trade secret, trademark or other Intellectual Property Rights ("IP Claim"), RealPage will indemnify, defend and hold harmless Client against the IP Claim and pay all costs and expenses (including reasonable legal fees, including on appeal) incurred and all damages, and all other amounts ancillary to the award of such damages, finally awarded against Client by a court of competent jurisdiction or agreed to in a written settlement agreement signed by Client and RealPage arising out of such IP Claim; *provided that:* (i) Client promptly notifies RealPage in writing after Client's receipt of notification of a potential claim; (ii) RealPage shall assume

Page5

REDACTED

REALPAGE00014

P.5

sole control of the defense of such claim with counsel of its choice which shall be a nationally recognized or regionally recognized law firm, and all related settlement negotiations; and (iii) Client provides RealPage, at RealPage's written request, with reasonable assistance, information and authority necessary to perform RealPage's obligations under this Section. Client's failure to notify RealPage promptly of notice of a claim shall not relieve RealPage of the obligation to indemnify Client unless such failure to notify shall have impaired RealPage's ability to defend such claim or action. If RealPage believes that the RealPage System or any Screening Product Center is likely to be determined to be an infringement or misappropriation of a patent, copyright, trade secret, trademark, or other proprietary right, RealPage shall modify or replace such RealPage System or Screening Product Center to make it non-infringing; provided, however, no such replacement or modification shall substantially impair the functionality or performance of such RealPage System or any Screening Product Center or (ii) terminate the license with respect to the infringing RealPage System of Screening Product Center. Client's to notify Client(s) promptly shall not relieve RealPage of the obligation to indemnify Client(s) unless such failure to notify promptly shall have materially impaired RealPage's ability to defend such claim or action."

10.    Amend Section 5, <u>Order and Supply of Information</u>, in its entirety to read as follows:

"When initially establishing an account with RealPage, Administrative Personnel designated by Client or Property Manager ("<u>Administrative Personnel</u>") will supply RealPage with Client Data reasonably required to identify the Site, Client, and any Site manager. Client shall order Information and shall use Information solely and exclusively for the purpose of determining the creditworthiness, criminal record and eviction history of individuals from whom Client(s) has accepted a signed rental application agreement relating to residency at the Site (the "<u>Permissible Purpose</u>"). When Client desires to receive Information concerning individuals for the Permissible Purpose, Administrative Personnel will supply RealPage with Client Data reasonably required to identify the prospective resident by completing the applicable Leasing templates. Upon receipt of this Client Data, RealPage shall use commercially reasonable efforts to promptly furnish the requested Information to Client. RealPage shall be under no obligation to provide any Information in any instance in which doing so would result in any violation of RealPage's obligations under the Fair Credit Reporting Act, 15 U.S.C. Section 1681 et seq., as amended (the "<u>Act</u>") or of RealPage's agreements with the Credit Bureaus. If no Information or only partial Information is available from any Credit Bureau or from its own resources, RealPage shall be relieved of the obligation hereunder to supply such Information or component thereof."

11.    Amend Section 6, <u>Client's Covenants and Certifications</u>, in its entirety to read as follows:

Page6

REDACTED                    REALPAGE00015

"Client agrees and covenants that: (i) it will not request or use any Information for any purpose prohibited by the terms of this Use Agreement, the Act or by other applicable law or regulation; (ii) it will request and use Information only for the Permissible Purpose; (iii) it will request and use Information solely as an end user; (iv) it will not resell, attempt to resell nor disclose any portion of the Information to any third party; (v) it will use the Information entirely at its own risk; (vi) it will bring no action or claim, and hereby irrevocably and completely waives and releases all future actions and claims, against RealPage or any Credit Bureau-for any injury or damage arising from or attributable to the provision, non-provision or use of any Information; (vii) RealPage shall have no obligation or liability for delays or nonperformance by the Credit Bureaus; (viii) it understands and acknowledges that Information from public records such as criminal and eviction data is often incomplete, untimely, inaccurate and subject to producing false positives; (ix) it understands and acknowledges that due to the organization of criminal records and/or the nature of the query there will be instances where no criminal information is reported with regard to persons who, in fact, have criminal records; (x) it understands and acknowledges that there is a wide diversity in the types of criminal records made available by various jurisdictions and in the content of such records; (xi) it understands and acknowledges certain laws restrict the use of certain criminal records for purposes related to housing or accommodations; (xii) it will use its own reasonable judgment with regard to undertaking independent verification of all negative criminal and eviction Information (with RealPage acknowledging that such decision is a decision made by Client for the sole benefit of Client); (xiii) only Administrative Personnel having a direct need to know and whose duties reasonably relate to processing applications for leases will be permitted to employ the RealPage Screening Product Center to order, receive or use Information; (xiv) Client will instruct all Administrative Personnel to read the Section to this Use Agreement entitled 'FCRA Requirements"; (xv) Client will instruct all Administrative Personnel to comply with all obligations stated in that Section which are applicable to them; (xvi) Client will instruct all Administrative Personnel to maintain all Information in strictest confidence and disclose it only as permitted by this Use Agreement, the Act (as amended) or by other applicable law; (xvii) Client will instruct all Administrative Personnel to read the Section to this Use Agreement entitled "Access Security Requirements"; and (xviii) Client will instruct all Administrative Personnel to comply with all obligations stated in that Section which are applicable to them. Client shall be responsible for the acts or omissions of its Administrative Personnel in complying with the requirements of this Section 6."

12. Amend Section 7, <u>Indemnification by Client</u>, it its entirety to read as follows:

"Client(s), at its own expense, shall indemnify, defend and hold RealPage harmless from and against losses, costs, and expenses (including legal fees and expenses) actually and reasonably incurred by RealPage in connection with any

REDACTED

REALPAGE00016

liability (including, without limitation, third party claims by applicants or residents) arising from (i) RealPage's possession or use of data submitted to RealPage by Client(s); provided that such information is used solely for the purposes set forth in this Agreement, (ii) Client(s)'s request for, access to, unauthorized access to, use or misuse of, possession of, disclosure of or reliance upon Information, (iii) Client(s)'s use of any Information in connection with any "scoring" model or procedure, and (iv) any violation by Client(s) of this Use Agreement, the Act or other applicable laws; *provided that; (i)* RealPage promptly notifies Client in writing after RealPage's receipt of notification of a potential claim; (ii) Client shall assume control of the defense of such claim with counsel of its choice, which must be approved by RealPage and all related settlement negotiations, which must be executed by RealPage; and (iii) RealPage provides Client, at Client's written request and Client's expense, with reasonable assistance, information and authority necessary to perform Client's obligations under this Section.   RealPage's failure to notify Client(s) promptly shall not relieve Client(s) of the obligation to indemnify RealPage unless such failure to notify promptly shall have materially impaired Client(s)'s ability to defend such claim or action."

13.    Amend the first sentence of Section 9, FCRA Requirements, to read as follows:

"Although the Act, as amended, primarily regulates the operations of consumer credit reporting agencies ("Credit Bureaus"), it also applies to RealPage's customers, such as Client(s), as users of information about consumers

14.    Amend Section 13, Limitation on Amount of Damages, in its entirety to read as follows:

"RealPage shall not be liable to Client for any damages, whether arising in contract, tort, strict liability or otherwise in an amount exceeding the aggregate of the Initial License Fee and Yearly Access Fees or Monthly Access Fees, as applicable, paid by Client for all Screening Product Centers licensed for the Site during the 12 month period preceding the occurrence of the event that gave rise to the damages except to the extent caused by RealPage's gross negligence, willful misconduct."

15.    Amend the first sentence of Section 14, Force Majeure, to read as follows:

"RealPage will not be liable to Client for any damages or injury, direct or indirect, caused by any delay or failure in its performance of any of the acts and obligations required by this Use Agreement if and to the extent that such delay or failure arises for reasons beyond the reasonable control of RealPage (other than those caused by RealPage's failure to pay its vendors, including but not limited to Credit Bureaus), including, without limitation, Third Party System Failures."

16.    Amend Section 18, Survival of Terms, in its entirety to read as follows:

Page8

REDACTED                                        REALPAGE00017

"The provisions of this Use Agreement applicable to (i) any Screening Product Center License; (ii) outstanding obligations of Client at the date of termination; (iii) warranty disclaimer; (iv) indemnifications; (v) limitation of liability, types of recoverable damages and amount of recoverable damages; (vi) integration; (vii) survival of terms; (viii) confidentiality and non-disclosure; and (ix) limitation of actions will survive termination or expiration of this Use Agreement."

17.   Amend Section 20, <u>RealPage's Ownership and Agreements</u>, in its entirety to read as follows:

"Client acknowledges that RealPage is the owner of all Screening Product Centers, the RealPage content (except for third party content), Derived Software, the RealPage databases and the RealPage data and that all Screening Product Centers are protected by copyright, trade secret and other intellectual property laws and legal precedent of the United States and other jurisdictions.   No title to or ownership of any Screening Product Center is transferred to Client by operation of this Use Agreement.  RealPage shall promptly comply with all present and future laws and ordinances, and all orders, rules, and regulations of all federal, state, county, municipal and other governmental authorities to the extent any of the foregoing are applicable to RealPage or its performance of Services hereunder (collectively, the "Laws"), including but not limited to the Act.  RealPage agrees that, unless required pursuant to any agreement with a Credit Bureau or requirement of the a Law, it shall not disclose any materials or information provided by Client or Property Manager or otherwise obtained by RealPage in connection with this Agreement, the results of any investigations or inspections completed by RealPage, the terms of this Agreement, any financial information concerning Client or Property Manager, or disclose any such information to any third party or parties, except as otherwise expressly allowed pursuant to the terms and provisions of this Agreement. Neither party shall make any press releases regarding the nature, terms or existence of this Agreement nor the transaction contemplated hereby. The provisions of this section shall survive the termination of this Agreement."

18.   In Section 22, <u>Miscellaneous</u>, all references to "certified mail", shall be references to "certified mail, return receipt requested".

19.   Amend the first sentence of Section 23, <u>Property Manager and RealPage Obligations</u>, to read as follows:

"SECTION 23 SHALL BE CONSIDERED TO BE A CONTRACT BY AND BETWEEN THE PROPERTY MANAGER AND REALPAGE."

20.   Amend Section 23(b), Representations and Warranties, in its entirety to read as follows:

REDACTED                    REALPAGE00018

P.2

"Property Manager represents and warrants to RealPage that Property Manager has been appointed by each Client, and has the authority pursuant to such agency, to: (i) enter into this Use Agreement and an ancillary Order Form on behalf of each such Client; and (ii) cause the payment, in behalf of each Client, of all invoices for Services in accordance with the provisions of any applicable RealPage Product Order Form and RealPage Price Schedule. RealPage represents and warrants to Client and Property Manager that RealPage has the authority to enter into this Use Agreement and an ancillary Order Form."

21.     Delete Sections 23(c) and Section 23(d) in their entirety.

22.     Amend Section 23(f), Cessation of Agency, in its entirety to read as follows:

"If Property Manager's agency relationship with regard to any Site ceases, Property Manager shall deliver to RealPage a written notice to such effect, and Property Manager's right to access and use the Services in behalf of Client at such Site shall immediately cease."

23.     Except as specifically set forth herein, the terms and conditions of the Master Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties have executed this Amendment through their duly authorized representatives as of the Effective Date.

**REALPAGE, INC.**

BY: _____

TITLE: _____CFO_____

DATE: ____4/30/08____

**FF PROPERTIES L.P., a Delaware limited partnership**
**By: FF Properties, Inc., a Delaware corporation,**
     **General Partner**

BY: _____

TITLE: ____President____

DATE: ____4/30/08____

REDACTED                REALPAGE00019



AMENDED AND RESTATED
AMENDMENT TO
APPLICANT SCREENING PRODUCT CENTER USE AGREEMENT

THIS AMENDED AND RESTATED AMENDMENT TO APPLICANT SCREENING PRODUCT CENTER USE AGREEMENT is entered into as of the Effective Agreement by and between RealPage, Inc. ("RealPage"), a Delaware corporation and FF Properties L.P. ("Client"), a Delaware limited partnership.

RECITALS:

WHEREAS, RealPage and Client entered into that certain Amendment to Applicant Screening Product Center Agreement on April 30, 2008 ("Amendment");

WHEREAS, RealPage and Client now wish to amend and restatement the Amendment;

WHEREAS, RealPage and Client have entered into that certain Applicant Screening Product Center Use Agreement of even date ("Master Agreement") pursuant to which RealPage shall provide to Client for all Sites it owns or manages (each a "Portfolio Sites"), either on its own behalf as owner of a Portfolio Site, or on behalf of third parties as fee manager of a Portfolio Site, the RealPage Applicant Screening Product Center ("Screening Product Center");

WHEREAS, Multifamily Internet Ventures LLC dba LeasingDesk Insurance Services ("LeasingDesk"), a wholly owned subsidiary of RealPage, and Client have entered into that certain Advertising Space Rental Agreement of even date whereby Client shall permit LeasingDesk to promote on an exclusive basis to residents of Portfolio Sites the LeasingDesk eRenterPlan™ renters' insurance ("Renters' Insurance"); and

WHEREAS, in consideration for Client's commitment to license the Screening Product Center for all Portfolio Sites for a period of three (3) years following the Effective Date, RealPage is willing to make certain pricing accommodations for Client, as more fully set forth herein.

NOW WHEREFORE, in consideration of the mutual premises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. In consideration for Client's commitment ("Commitment") to (i) license the Screening Product Center for all Portfolio Sites for a period commencing on the Effective Date (as defined in the Master Agreement) and expiring on July 31, 2011 ("Commitment Period"); (ii) activate the Screening Product Center on all

**REDACTED**                    **REALPAGE00020**

Portfolio Sites on or before July 31, 2008 and (iii) use commercially reasonable efforts to promote Renters' Insurance at all Portfolio Sites, RealPage shall make the following pricing concessions:

a. For the Applicant Screening Product Center: In consideration of the Commitment, the following Monthly Access Fees shall apply to Portfolio Sites, based upon the penetration of Renters' Insurance at Portfolio Sites:

| Screening Product Center | Monthly Access Fee per Unit, with Criminal | Monthly Access Fee per unit, excluding Criminal | Renters' Insurance Penetration[1] |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

- *With regard to Renters' Insurance:* RealPage and Client shall review on a quarterly basis in arrears the Renters' Insurance Penetration at each Portfolio Site, and, based on the tier within which the then current Renters' Insurance Penetration falls for such Site, RealPage shall adjust the applicable Monthly Access Fee for the Screening Product Center at such Site, effective as of the next occurring billing cycle for all Portfolio Sites.

- *With regard to the Screening Product Center:* RealPage and Client shall review on a quarterly basis in arrears the Screening Product Center utilization at each Portfolio Site, and if there appears to be over utilization or under utilization of the Screening Product Center at a Portfolio Site, RealPage shall so notify Client, and Client shall pay to RealPage the applicable PPU "true up", as described in the Master Agreement, at the end of the then current Term in the amount of the then current per transactions Applicant Screening charges, which current, for Portfolio Sites in California is $8.40 per report, and outside of California, is $12.00 per report.

- *With regard to the Screening Product Center Implementation:* Client shall implement the Screening Product Center at all Portfolio Sites on or before July 31, 2008. In the event Client implements the Screening Product Center at all Portfolio Sites on or before July 31, 2008, RealPage shall waive all Monthly Access fees for the Screening Product Center for active Portfolio Sites, through June 30, 2008.

- *With regard to Screening Product Center Pricing:* In consideration of the Commitment:

---

[1] For purposes of this Agreement, Renters' Insurance Penetration shall mean, as to a Portfolio Site or the Portfolio, the percentage of residents purchasing Renters' Insurance from LeasingDesk.

Page2

REDACTED                    REALPAGE00021

- RealPage shall not increase prior to the end of the Commitment Period, any Monthly Access Fees to exceed above those set forth above, other than within the context of the adjustments based on Renters' Insurance Penetration; *provided however,* and notwithstanding the pricing commitment made by RealPage in the preceding clause, RealPage may increase the Monthly Access Fees if it experiences an increase in thirty party vendor fees or other expenses over which it has not control (e.g., data providers, credit bureaus, postage, and interchange and other fees imposed by an ODFI, reconverting bank or credit card associations, etc); and

- during the Commitment Period, RealPage shall not impose on Client for any Portfolio Site any premium charges otherwise imposed on a user for eviction searches within certain States.

b.  OneSite Leasing & Rents.  Where Client elects to license from RealPage the OneSite Leasing & Rents Product Center for use at a Portfolio Site, RealPage shall issue to Client a credit an amount per Portfolio Site equal to all Fees paid for such Portfolio Site for the Yardi Screening Interface, █████████ per Portfolio Site, effective upon activation[2] of OneSite Leasing & Rents at that Portfolio Site.

2.  To the extent any of the terms and conditions of this Amendment varies from those of the Master Agreement, this Amendment shall control.

3.  Capitalized terms used in this Amendment which are defined in the Master Agreement and not otherwise defined in this Amendment shall have the meanings assigned in the Master Agreement.

4.  Amend the Premises provision of the Master Agreement in its entirety to read as follows:

"The undersigned manages multi-family communities (each a "Site"), either on its own behalf as owner of the Site, or as an agent of the owner of the Site ("Property Manager"). In all instances, the undersigned, whether executing this Use Agreement (as defined below) as owner of the Site, or as agent for the owner of the Site, is referred to herein as the "Client". RealPage, Inc. ("RealPage") is the owner and licensor of a multi-family applicant screening system and service known as the Applicant Screening Product Center (the "Screening Product Center" or the "Service"), which assists Clients in evaluating applications made by persons desiring to lease apartments at Sites.  Through use of the Service, Client accesses information from the databases of the national credit bureaus ("Credit Bureaus"), third party databases and from RealPage's own databases.

---

[2] "Activation" occurs as to a Site when Site Owner Data for the Site is accessible through the OneSite Leasing & Rents Product Center, regardless of whether the Product Center is in production.

REDACTED                    REALPAGE00022

Such information may include, without limitation, credit history, resident history, criminal history and eviction history (all of the information available through use of the Services, the "Information"). Client desires to license access to and use the Service at Sites. This Applicant Screening Product Center Use Agreement ("Use Agreement") sets forth the terms and conditions under which RealPage licenses the Screening Product Center to Client for each Site designed on the corresponding order form ("Order Form"). The Order Form identifies the Screening Product Centers that Client wishes to license, the Sites for which the Screening Product Centers have been licensed, along with the commercial terms for the license of these Screening Product Centers.   Once the parties have executed a Use Agreement and a corresponding Order Form, the parties shall have created a binding, legally enforceable obligation for RealPage to provide and Client to accept and pay for each of the Screening Product Centers for each Site shown on the Order Form. The Use Agreement and Order Form for each Site shall be Site specific and shall be a separate and independent agreement by and between RealPage and the Client, performable and terminable separately from all other Use Agreements.  RealPage and Client intend to be legally bound by the provisions of Sections 1 through 22. RealPage and Property Manager, on its own behalf, each intend to be legally bound by the provisions of Section 23 of this Use Agreement."

5.     Amend Section 1, Charges and Payments, in its entirety to read as follows:

"Client shall be responsible for payment of all charges arising under the terms of this Use Agreement for each Site, and Client shall pay RealPage for the Service either on its own behalf or through the agency of the Property Manager. The Yearly Access Fee for the Service is an amount equal to the number of units at the Site multiplied by the Projected Percentage Utilization (PPU) for the each Site set forth on the Order Form.  The PPU represents the projected number of Service reports run for the Site in a year, divided by the total number of units at the Site rounded up or down to the nearest 10%.  The per unit Yearly Access Fee shall an amount equal to the Yearly Access Fee divided by the number of units at the Site. If the actual number of Service reports ordered for the Site during any one-year License term for the Screening Product Center multiplied by the per unit Yearly Access Fee differs from the actual amount billed for Service for the Site by more than 10%, then RealPage will charge Client at the end of each Term a "true up" charge equal to the additional number of Service reports ordered in excess of the permitted 10%, multiplied by the per unit Yearly Access Fee, and the "true up" charge shall be due within 30 days of the date of such invoice. Client shall pay any tax (and related interest and penalties if Client fails to pay any amounts owed within ten (10) days after Client's receipt of written notice detailing such failure) imposed for Client's access to or use of the Screening Product Centers, or as a result of the existence or operation of this Use Agreement, including any tax that Client is required to withhold or deduct from payments to RealPage, other than tax imposed on RealPage's net income or corporate existence. Notwithstanding any other provision in this Agreement, RealPage may adjust prices for the

Page4

REDACTED                          REALPAGE00023

Services at any time with at least thirty (30) days prior written notice to Manager ("Notice") and the new prices shall be effective on the date identified in the applicable Notice, but in no event prior to the termination of such thirty (30) day period. If the prices for the Services increase by more than 10% from the prices charged prior to such Notice, Client may at its option elect to terminate this Agreement upon written notice to RealPage.

6.    Amend the last sentence of the first paragraph of Section 4(a), <u>Screening Product Center Warranty,</u> to read as follows:

"The most current version of Screening Product Center Specifications and Service Level Specifications can be found, from time to time, at http://www.specifications.controls.realpage.com."

7.    Amend the first sentence of the second of Section 4(a), <u>Screening Product Center Warranty,</u> to read as follows:

"RealPage shall not modify or remove material functionality from the Screening Product Center Specifications unless it provides Client no less than 60 days prior written notice of such modification and, in such case, Client may at its option elect to terminate this Agreement at any time after receipt of such notice by delivering written notice to RealPage."

8.    Amend the second sentence of Section 4(c), <u>For Claims Relating to Information,</u> to read as follows:

"If RealPage is unable to provide such remedy, RealPage shall notify Client in writing of such inability and shall grant Client a credit of an amount equal to the Yearly Access Fee calculated on a monthly basis ("Monthly Access Fee") for the applicable Site divided by the number of Information requests made by the applicable Site in the month in which RealPage conducts a re-run of the Information."

9.    Amend Section 4(d), <u>Intellectual Property Indemnity,</u> it its entirety to read as follows:

"If a third party makes a claim against Client that the access to the Screening Product Center or use of the Service licensed by Client pursuant to this Use Agreement, excluding any of the Client Data, directly infringes any United States patent issued as of the date of this Use Agreement or any copyright, trade secret, trademark or other Intellectual Property Rights ("IP Claim"), RealPage will indemnify, defend and hold harmless Client against the IP Claim and pay all costs and expenses (including reasonable legal fees, including on appeal) incurred and all damages, and all other amounts ancillary to the award of such damages, finally awarded against Client by a court of competent jurisdiction or agreed to in a written settlement agreement signed by Client and RealPage arising out of such IP

REDACTED          REALPAGE00024

Claim; *provided that:* (i) Client promptly notifies RealPage in writing after Client's receipt of notification of a potential claim; (ii) RealPage shall assume sole control of the defense of such claim with counsel of its choice which shall be a nationally recognized or regionally recognized law firm, and all related settlement negotiations; and (iii) Client provides RealPage, at RealPage's written request, with reasonable assistance, information and authority necessary to perform RealPage's obligations under this Section. Client's failure to notify RealPage promptly of notice of a claim shall not relieve RealPage of the obligation to indemnify Client unless such failure to notify shall have impaired RealPage's ability to defend such claim or action. If RealPage believes that the RealPage System or any Screening Product Center is likely to be determined to be an infringement or misappropriation of a patent, copyright, trade secret, trademark, or other proprietary right, RealPage shall modify or replace such RealPage System or Screening Product Center to make it non-infringing; provided, however, no such replacement or modification shall substantially impair the functionality or performance of such RealPage System or any Screening Product Center or (ii) terminate the license with respect to the infringing RealPage System of Screening Product Center. Client's to notify Client(s) promptly shall not relieve RealPage of the obligation to indemnify Client(s) unless such failure to notify promptly shall have materially impaired RealPage's ability to defend such claim or action."

10.  Amend Section 5, <u>Order and Supply of Information,</u> in its entirety to read as follows:

"When initially establishing an account with RealPage, Administrative Personnel designated by Client or Property Manager ("<u>Administrative Personnel</u>") will supply RealPage with Client Data reasonably required to identify the Site, Client, and any Site manager. Client shall order Information and shall use Information solely and exclusively for the purpose of determining the creditworthiness, criminal record and eviction history of individuals from whom Client(s) has accepted a signed rental application agreement relating to residency at the Site (the "<u>Permissible Purpose</u>"). When Client desires to receive Information concerning individuals for the Permissible Purpose, Administrative Personnel will supply RealPage with Client Data reasonably required to identify the prospective resident by completing the applicable Leasing templates. Upon receipt of this Client Data, RealPage shall use commercially reasonable efforts to promptly furnish the requested Information to Client. RealPage shall be under no obligation to provide any Information in any instance in which doing so would result in any violation of RealPage's obligations under the Fair Credit Reporting Act, 15 U.S.C. Section 1681 et seq., as amended (the "<u>Act</u>") or of RealPage's agreements with the Credit Bureaus. If no Information or only partial Information is available from any Credit Bureaus or from its own resources, RealPage shall be relieved of the obligation hereunder to supply such Information or component thereof."

REDACTED          REALPAGE00025

11.  Amend Section 6, Client's Covenants and Certifications, in its entirety to read as follows:

"Client agrees and covenants that:  (i) it will not request or use any Information for any purpose prohibited by the terms of this Use Agreement, the Act or by other applicable law or regulation; (ii) it will request and use Information only for the Permissible Purpose; (iii) it will request and use Information solely as an end user; (iv) it will not resell, attempt to resell nor disclose any portion of the Information to any third party; (v) it will use the Information entirely at its own risk; (vi) it will bring no action or claim, and hereby irrevocably and completely waives and releases all future actions and claims, against RealPage or any Credit Bureau for any injury or damage arising from or attributable to the provision, non-provision or use of any Information; (vii) RealPage shall have no obligation or liability for delays or nonperformance by the Credit Bureaus; (viii) it understands and acknowledges that Information from public records such as criminal and eviction data is often incomplete, untimely, inaccurate and subject to producing false positives; (ix) it understands and acknowledges that due to the organization of criminal records and/or the nature of the query there will be instances where no criminal information is reported with regard to persons who, in fact, have criminal records; (x) it understands and acknowledges that there is a wide diversity in the types of criminal records made available by various jurisdictions and in the content of such records; (xi) it understands and acknowledges certain laws restrict the use of certain criminal records for purposes related to housing or accommodations; (xii) it will use its own reasonable judgment with regard to undertaking independent verification of all negative criminal and eviction Information (with RealPage acknowledging that such decision is a decision made by Client for the sole benefit of Client); (xiii) only Administrative Personnel having a direct need to know and whose duties reasonably relate to processing applications for leases will be permitted to employ the RealPage Screening Product Center to order, receive or use Information; (xiv) Client will instruct all Administrative Personnel to read the Section to this Use Agreement entitled "FCRA Requirements"; (xv) Client will instruct all Administrative Personnel to comply with all obligations stated in that Section which are applicable to them; (xvi) Client will instruct all Administrative Personnel to maintain all Information in strictest confidence and disclose it only as permitted by this Use Agreement, the Act (as amended) or by other applicable law; (xvii) Client will instruct all Administrative Personnel to read the Section to this Use Agreement entitled "Access Security Requirements"; and (xviii) Client will instruct all Administrative Personnel to comply with all obligations stated in that Section which are applicable to them.  Client shall be responsible for the acts or omissions of its Administrative Personnel in complying with the requirements of this Section 6."

12.  Amend Section 7, Indemnification by Client, it its entirety to read as follows:

Page 7

REDACTED

REALPAGE00026

"Client(s), at its own expense, shall indemnify, defend and hold RealPage harmless from and against losses, costs, and expenses (including legal fees and expenses) actually and reasonably incurred by RealPage in connection with any liability (including, without limitation, third party claims by applicants or residents) arising from (i) RealPage's possession or use of data submitted to RealPage by Client(s); provided that such information is used solely for the purposes set forth in this Agreement, (ii) Client(s)'s request for, access to, unauthorized access to, use or misuse of, possession of, disclosure of or reliance upon Information, (iii) Client(s)'s use of any Information in connection with any "scoring" model or procedure, and (iv) any violation by Client(s) of this Use Agreement, the Act or other applicable laws; _provided that:_ (i) RealPage promptly notifies Client in writing after RealPage's receipt of notification of a potential claim; (ii) Client shall assume control of the defense of such claim with counsel of its choice, which must be approved by RealPage and all related settlement negotiations, which must be executed by RealPage; and (iii) RealPage provides Client, at Client's written request and Client's expense, with reasonable assistance, information and authority necessary to perform Client's obligations under this Section. RealPage's failure to notify Client(s) promptly shall not relieve Client(s) of the obligation to indemnify RealPage unless such failure to notify promptly shall have materially impaired Client(s)'s ability to defend such claim or action."

13.   Amend the first sentence of Section 9, FCRA Requirements, to read as follows:

"Although the Act, as amended, primarily regulates the operations of consumer credit reporting agencies ("Credit Bureaus"), it also applies to RealPage's customers, such as Client(s), as users of information about consumers

14.   Amend Section 13, Limitation on Amount of Damages, in its entirety to read as follows:

"RealPage shall not be liable to Client for any damages, whether arising in contract, tort, strict liability or otherwise in an amount exceeding the aggregate of the Initial License Fee and Yearly Access Fees or Monthly Access Fees, as applicable, paid by Client for all Screening Product Centers licensed for the Site during the 12 month period preceding the occurrence of the event that gave rise to the damages except to the extent caused by RealPage's gross negligence, willful misconduct."

15.   Amend the first sentence of Section 14, Force Majeure, to read as follows:

"RealPage will not be liable to Client for any damages or injury, direct or indirect, caused by any delay or failure in its performance of any of the acts and obligations required by this Use Agreement if and to the extent that such delay or failure arises for reasons beyond the reasonable control of RealPage (other than

REDACTED

REALPAGE00027

those caused by RealPage's failure to pay its vendors, including but not limited to Credit Bureaus), including, without limitation, Third Party System Failures."

16. Amend Section 18, <u>Survival of Terms</u>, in its entirety to read as follows:

"The provisions of this Use Agreement applicable to (i) any Screening Product Center License; (ii) outstanding obligations of Client at the date of termination; (iii) warranty disclaimer; (iv) indemnifications; (v) limitation of liability, types of recoverable damages and amount of recoverable damages; (vi) integration; (vii) survival of terms; (viii) confidentiality and non-disclosure; and (ix) limitation of actions will survive termination or expiration of this Use Agreement."

17. Amend Section 20, <u>RealPage's Ownership and Agreements</u>, in its entirety to read as follows:

"Client acknowledges that RealPage is the owner of all Screening Product Centers, the RealPage content (except for third party content), Derived Software, the RealPage databases and the RealPage data and that all Screening Product Centers are protected by copyright, trade secret and other intellectual property laws and legal precedent of the United States and other jurisdictions. No title to or ownership of any Screening Product Center is transferred to Client by operation of this Use Agreement. RealPage shall promptly comply with all present and future laws and ordinances, and all orders, rules, and regulations of all federal, state, county, municipal and other governmental authorities to the extent any of the foregoing are applicable to RealPage or its performance of Services hereunder (collectively, the "Laws"), including but not limited to the Act. RealPage agrees that, unless required pursuant to any agreement with a Credit Bureau or requirement of the a Law, it shall not disclose any materials or information provided by Client or Property Manager or otherwise obtained by RealPage in connection with this Agreement, the results of any investigations or inspections completed by RealPage, the terms of this Agreement, any financial information concerning Client or Property Manager, or disclose any such information to any third party or parties, except as otherwise expressly allowed pursuant to the terms and provisions of this Agreement. Neither party shall make any press releases regarding the nature, terms or existence of this Agreement nor the transaction contemplated hereby. The provisions of this section shall survive the termination of this Agreement."

18. In Section 22, <u>Miscellaneous</u>, all references to "certified mail", shall be references to "certified mail, return receipt requested".

19. Amend the first sentence of Section 23, <u>Property Manager and RealPage Obligations</u>, to read as follows:

"SECTION 23 SHALL BE CONSIDERED TO BE A CONTRACT BY AND BETWEEN THE PROPERTY MANAGER AND REALPAGE."

Page9

REDACTED                    REALPAGE00028

20.   Amend Section 23(b), Representations and Warranties, in its entirety to read as follows:

"Property Manager represents and warrants to RealPage that Property Manager has been appointed by each Client, and has the authority pursuant to such agency, to:  (i) enter into this Use Agreement and an ancillary Order Form on behalf of each such Client; and (ii) cause the payment, in behalf of each Client, of all invoices for Services in accordance with the provisions of any applicable RealPage Product Order Form and RealPage Price Schedule.  RealPage represents and warrants to Client and Property Manager that RealPage has the authority to enter into this Use Agreement and an ancillary Order Form."

21.   Delete Sections 23(c) and Section 23(d) in their entirety.

22.   Amend Section 23(f), <u>Cessation of Agency</u>, in its entirety to read as follows:

"If Property Manager's agency relationship with regard to any Site ceases, Property Manager shall deliver to RealPage a written notice to such effect, and Property Manager's right to access and use the Services in behalf of Client at such Site shall immediately cease."

23.   Except as specifically set forth herein, the terms and conditions of the Master Agreement are hereby ratified and confirmed.

   IN WITNESS WHEREOF, the parties have executed this Amendment through their duly authorized representatives as of the Effective Date.

**REALPAGE, INC.**

BY: _____

TITLE: _____

DATE: _____

**FF PROPERTIES L.P., a Delaware limited partnership**
 **By: FF Properties, Inc., a Delaware corporation,**
   **General Partner**

BY: _____

TITLE: _Sr. Vice President_

DATE: _9-12-08_

Page 10

**REDACTED**                    **REALPAGE00029**



Second Amendment
to
Applicant Screening Product Center Use Agreement
(FF Properties L.P.)

This Second Amendment supplements and amends that certain Applicant Screening Product Center Use Agreement ("Addendum") between RealPage, Inc. and the undersigned dated April 30, 2008.

1.  **To the extent any of the terms and conditions of this Addendum vary from those of the Agreement, this Addendum shall control.**

2.  **Capitalized terms used in this Addendum which are defined in the Agreement and not otherwise defined in this Addendum shall have the meanings assigned in the Agreement.**

3.  **Amend Section 2, <u>Charges and Payments</u>, in its entirety to read as follows:**

    "Site Owner shall be responsible for payment of all charges arising under the terms of this Agreement for each Site, and Site Owner shall pay RealPage the Applicant Screening Product Center Fee set forth on the Order Form either on its own behalf or through the agency of the Property Manager. Site Owner shall pay any tax (and related interest and penalties) imposed for Site Owner's access to or use of the Screening Product Center or the existence of this Addendum, including any tax that Site Owner is required to withhold or deduct from payments to RealPage, other than tax imposed on RealPage's net income or corporate existence. Notwithstanding any other provision in this Agreement, RealPage may adjust prices for the Services at any time with prior notice to Manager ("<u>Notice</u>") and the new prices shall be effective on the date identified in the applicable Notice."

4.  **Except to the extent set forth herein, the Agreement is hereby ratified and affirmed.**

[SIGNATURE PAGE TO FOLLOW]

REDACTED                REALPAGE00030

**∴ R E A L P A G E°**

**REALPAGE, INC.**

BY: _____

TITLE:   Timothy J. Barker
         Executive Vice President

EFFECTIVE DATE: **8/23/10**

~~FF PROPERTIES L.P.xxxx~~

~~BYxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

~~TITLExxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

                        FF PROPERTIES L.P.,
                        a Delaware limited partnership

                        By:    Fairfield Property Management Inc.
                               a Delaware corporation

                        By: _____

                        Name:      Kim Bender
                        Title:     Vice President

REDACTED                          REALPAGE00031

# REALPAGE®

**Order Form**

4000 International Parkway   Carrollton, Texas 75007

FF PROPERTIES L.P.
5510 MOREHOUSE DR STE 200
SAN DIEGO, CA 92121-3722
UNITED STATES
(858) 457-2123, (858) 457-3759 fax

| Customer ID | Sites | Units/Beds |
|---|---|---|
| C0901 003 629 | 2 | 752 / -- |
| Order No | Order Creation Date | Exp Date |
| Q1112 000 452 | 12/08/2011 | 01/08/2012 |

This Order Form is incorporated by this reference into the Applicant Screening Product Center Use Agreement dated 04/30/2008 by and between RealPage Inc. and the Site Owners of the Sites listed here. Execution of this Order Form shall obligate RealPage Inc. to provide and the Site Owner(s) of the Sites listed hereon to accept and pay for the Product Centers or Services set forth on this Order Form

## ORDER SUMMARY

| Products | Qty | ILF($) | Access($) | Billing | Measure |
|---|---|---|---|---|---|
| LeasingDesk Screening | | | | | |
| LeasingDesk Screening Business Credit Report | | | | | |
| LeasingDesk Screening Criminal Classification | | | | | |
| LeasingDesk Screening Multistate Criminal Search | | | | | |

| Property Name | Site ID | Owner Name | City | State | Units/Beds | PPU % |
|---|---|---|---|---|---|---|
| LEGEND OAKS | 1002605 | FAIRFIELD LEGEND OAKS LLC | DENVER | CO | | N/A |

(1)  Initial License Fees are one-time, non-refundable fees, which will be invoiced and due upon execution of this Order Form.
(2)  Setups which require manual data entry on the part of RealPage, Inc. personnel (other than Rent Roll or HUDManager 2000) or from a fully completed OneSite Excel Questionnaire are billable at $75.00 per hour.
(3)  Use of certain Product Centers and Services may be subject to additional Dependencies and Uses. Please refer to http://www.specifications.controls.realpage.com, incorporated here by reference.
(4)

# R E A L P A G E·

**Order Form**

4000 International Parkway   Carrollton, Texas 75007

By executing this Order Form below, the undersigned represents and warrants to RealPage Inc. that it is the Site Owner or the duly appointed agent of the Site Owner of the Site(s) identified on the Order Form ("Agent"), and has the authority either on its own behalf or pursuant to such agency agreement, to: (i) execute the Order Form; (ii) enter into this Order Form on behalf of each such Site Owner; and (iii) administer the payment, on behalf of each Site Owner, of all invoices for all fees and charges associated with implementation (including Fees), access and use of the applicable Product Centers or Services on behalf of each Site in accordance with the terms of the Order Form. Agent shall defend, indemnify, and hold harmless RealPage Inc. from and against any and all claims, losses, or liabilities (including reasonable attorneys' fees and expenses) arising, directly or indirectly, from any misrepresentation by Agent with regard to the existence and scope of its agency relationship with any Site Owner, including, without limitation, losses or liabilities arising from any misrepresentation concerning its authority to bind any Site Owner to the payment provisions of this Agreement. In addition, by executing this Order Form below, the undersigned represents and warrants to RealPage Inc. that the Products, Services, Fees, and Charges provided in this Agreement constitute approved expenditures within the Site operating budget adopted by Site Owner.

Through agency of ☐ Or  Site Owner ☐

**FF PROPERTIES L.P.**
**5510 MOREHOUSE DR STE 200**
**SAN DIEGO, CA 92121-3722**
**UNITED STATES**

By:
Title:
Date:  DEC - 9 2011

**RealPage Inc.**
**4000 International Parkway**
**Carrollton, Texas 75007**
**United States**

By: Timothy J. Barker
Title: Chief Financial Officer
Effective Date:

| Account Manager: | Julie Hefl |
|---|---|
| Date: | 12/08/2011 |

Distribution Stamp:   Order Form Process
Authorized By:        Megan Seeba
Date/Time:            12/12/2011 10:53:55 AM

Quote Number:         Q1112000452
PMC Name:             FF PROPERTIES L.P.
OMS Customer Number:  C0901003629

| Action Type | Action Date | Action Comment |
|---|---|---|
| Reviewed and Routed to Product | 12/12/2011 | Screening |

Distribution Total::   0.00
Difference::           0.00

**Client Contact Name**

**Contact Phone Number**

**Additional Information for Implementation**

REDACTED                          REALPAGE00034